UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JERMAINE COLEMAN,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

CIVIL ACTION NO. 22 Civ. 5936 (SLC)

**OPINION AND ORDER**

**SARAH L. CAVE,** United States Magistrate Judge.

## I. **INTRODUCTION**

Four years and a three-day bench trial later, this matter ends back where it started, with eyes fixed firmly on Plaintiff Jermaine Coleman's right knee.  Mr. Coleman sues Defendant United States of America (the "Government") under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) et seq. (the "FTCA"), for personal injuries arising out of an automobile accident he alleges occurred on March 27, 2021 (the "March Accident").[1]  (ECF No. 4 (the "Complaint")). Following a bench trial from May 12–14, 2025, the parties submitted proposed findings of fact and conclusions of law.  (ECF Nos. 75; 76).

This Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1).  To the extent that any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.  As set forth below, Mr. Coleman did not meet his burden to show that the Government acted with

---

[1] The Government strongly contests that any accident occurred on March 27, 2021 (see, e.g., ECF No. 76 at 7–8), and as explained below, Mr. Coleman has not convinced us that an accident causing traumatic injury to his right knee occurred as he described.  (See § III.B, infra).  We use the term "March Accident" for simplicity and convenience, not to indicate any factual or legal conclusion.

negligence or that he suffered a serious injury, so judgment will be entered in favor of the Government and this action will be dismissed.

## II. FINDINGS OF FACT

The factual record contains the testimony of eight witnesses, over three dozen evidentiary exhibits—only one of which was admitted over an objection—and demonstratives the Government used at trial.[2]

The trial witnesses included: Mr. Coleman; Marcos Martinez, a United States Postal Service ("USPS") employee who drove the Government-owned USPS truck that allegedly side-swiped Mr. Coleman's vehicle during the March Accident; Benedict Williams, Mr. Martinez's USPS supervisor; Kourtney Peralta, a New York City Police Officer who responded to the March Accident; Dr. Kevin Wright, Mr. Coleman's medical expert; Dr. Joseph Bosco, the Government's medical expert; Dr. David Bizzak, the Government's accident reconstruction expert; and, Nicholas Cavalcanti, a Special Agent in the USPS Office of the Inspector General.[3]

---

[2] The parties reserved "their right to object in part to the accident report[]," (ECF No. 68 at 22:11–13), but did not press those objections further at trial or in their post-trial submissions. (See generally ECF Nos. 68; 70; 72; 75; 76). In addition, although Mr. Coleman objected to the introduction of a surveillance video (DX-Z; see ECF No. 70 at 121:7–14 (overruling Mr. Coleman's objection to DX-Z)), he did not include in his post-trial submission any argument for its exclusion (ECF No. 75), and therefore has abandoned any such objection. See Annam v. City of New York, No. 22 Civ. 2945 (LGS), 2023 WL 35053, at *1 (S.D.N.Y. Jan. 4, 2023) ("[W]hen a party fails adequately to present arguments in a brief, a court may properly consider those arguments abandoned[.]") (quoting Malik v. City of New York, 841 F. App'x 281, 284 (2d Cir. 2021) (summary order)). In any event, the Government introduced the surveillance video solely for impeachment purposes—to rebut Mr. Coleman's testimony that he had difficulty negotiating stairs since the March Accident (ECF No. 68 at 51:18–23, 65–66, 71:15–24; PX-4 at McCulloch - Page 14)— and therefore was not required to disclose it before trial. See Fed. R. Civ. P. 26(a)(1)(A)(ii).

[3] We note that Mr. Coleman attended the first morning of trial to testify and did not appear for the remainder of the proceedings, although his absence plays no role in our conclusions. (ECF Nos. 70 at 2:6–9; 72 at 66:11–13).

The trial exhibits included: Mr. Coleman's medical records (JX-2; PX-1; PX-2; PX-3; PX-4; PX-5; PX-6; DX-K; DX-L; DX-M; DX-N; DX-O; DX-P; DX-Q; DX-R; DX-S; DX-T; DX-U); Mr. Coleman's personnel file detailing his former employment with the City of New York (DX-X); photographs of the parties' vehicles and from Mr. Coleman's Instagram account (JX-3; DX-E–DX-G); witness statements and accident reports (JX-1; DX-A–DX-D); police bodycam footage (DX-H–DX-I); the declarations of Dr. Wright and Dr. Bosco (PX-7; DX-W); the declaration of Dr. Bizzak and accompanying photographs (DX-V; DX-J); an excerpt from Mr. Coleman's deposition transcript (DX-Y); a map depicting where the March Accident allegedly occurred (JX-4); and a video of Mr. Coleman ascending flights of stairs (DX-Z).[4]

### A. Events on March 27, 2021

Around midday on March 27, 2021, Mr. Coleman—then fifty years old and not employed—parked his 2009 dark gray four-door Cadillac CTS4 sedan (the "Cadillac") on the right side of Freeman Street in the Bronx, near the street curb and a fire hydrant and pointing towards the intersection with Chisholm Street, to answer a telephone call on his way home from a friend's house. (JX-1; JX-4; ECF No. 68 at 12:5–7, 15:22–19:4; DX-X). Freeman Street has two lanes— wide enough for two opposing vehicles to pass each other while staying in their respective lanes—and cars were parked on both sides of that flat street when the March Accident occurred. (ECF Nos. 68 at 19:16–20:24, 93:19–24; 70 at 44:4–6). The roads were dry, and the weather was clear. (ECF No. 68 at 19:12–15, 82:2–3). Mr. Coleman sat in the driver's seat of his parked Cadillac without wearing a seatbelt. (Id. at 21:8–12).

---

[4] Citations to evidentiary exhibits employ the following terms: "JX" refers to a joint exhibit; "PX" refers to one of Mr. Coleman's exhibits; and "DX" refers to a Government exhibit.

Mr. Martinez—a four-year USPS employee who is a city carrier at the Southern Boulevard station in the Bronx—drove a white, two-ton Government-owned USPS truck (the "Truck") west down Freeman Street toward the intersection with Chisholm Street on his way to pick up a package at 850 Jennings Street. (ECF No. 68 at 76:1–78:10, 79:3–82:10; JX-3). Mr. Martinez was about three or four hours into his work shift, was "not [driving] very fast[,]" and "came to a complete stop at the stop sign" at the Freeman Street and Chisholm Street intersection, signaling that he intended to turn right onto Chisholm Street. (Id. at 80:7–9, 81:10–14, 81:21–23).

According to Mr. Coleman, before Mr. Martinez stopped at the intersection, Mr. Coleman was "looking down at the GPS area" near the console in the Cadillac when he "heard" "like a scrape, a metal-on-metal scrape sound, a screech[,]" and he "felt the [Cadillac] rock." (ECF No. 68 at 23:19–24:6 (the "Sideswipe")). Mr. Coleman testified that he felt an impact akin to "a jolt, a shake, a push around." (Id. at 24:7–10). When he felt the impact, Mr. Coleman said he "went to the right a little." (Id. at 24:11–13). Initially, on direct examination, Mr. Coleman testified that when he looked up, he "saw a truck, a whitish truck moving past" him that then stopped near the intersection for "about two, three minutes." (Id. at 24:14–21, 26:1–2). Later, on redirect examination, Mr. Coleman said he was sitting in the Cadillac, parked "maybe four cars" behind the intersection, and that he "looked right up" after he "felt the jolt" from the alleged impact and saw "black." (Id. at 74:10–16, 73:9–16, 73:21–23 ("When I looked up, I look to the side of me. When I felt it, I looked over to the side. It was dark. It was dark.")). Mr. Coleman did not exit the Cadillac after the alleged Sideswipe, but he "hit the horn a couple of times" to "get [Mr. Martinez's] attention." (Id. at 26:17–27:6). He said that the Truck was moving "semi-fast" and when he "looked up" after the Sideswipe, the Truck "stopped right at the corner." (Id. at

74:5–9, 74:17–20).  Then the Truck turned right, so Mr. Coleman followed it in the Cadillac.  (Id.

at 26:17–27:10).  Mr. Coleman believed that when Mr. Martinez saw him driving behind the

Truck, Mr. Martinez "raced" for "[m]aybe a block and a half" while Mr. Coleman continued to

"hit[] the horn."  (Id. at 26:23–27:10).  Both vehicles stopped near 850 Jennings Street.  (Id. at

27:11–14, 94:10–11).

Recalling the events before he stopped at 850 Jennings Street, Mr. Martinez testified that

he was driving about five miles per hour as he approached the stop sign at the Freeman and

Chisholm Street intersection, where he stopped for "[a] few seconds."  (ECF No. 68 at 94:19–23,

96:2–3).  Mr. Martinez said that the Truck did not collide with another vehicle, he did not feel or

hear anything unusual before he stopped at the intersection, and he did not hear anyone

sounding a car horn.  (Id. at 81:15–20, 94:12–13).  He then continued to drive toward 850

Jennings Street for his next scheduled stop and noticed "someone was trying to wave [him]

down" after he "glanced" in the Truck's mirror.  (Id. at 82:9–16).  Mr. Martinez pulled over near

850 Jennings Street and exited the Truck to speak with Mr. Coleman.  (Id. at 82:17–24, 98:21–

99:18).  Mr. Martinez said that USPS customers sometimes "flag [him] down and try to talk to

[him,]" so when he pulled over at 850 Jennings Street, he exited the Truck and approached

Mr. Coleman "to basically inquire what . . . was going on, like was he looking for a package[.]"

(Id. at 82:17–24).

Mr. Coleman testified that, after parking their vehicles, Mr. Martinez spoke to another

person and then approached Mr. Coleman.  (ECF No. 68 at 28:8–11).  Mr. Martinez testified that

he exited the Truck, approached Mr. Coleman, and Mr. Coleman asked Mr. Martinez whether he

sideswiped the Cadillac with the Truck.[5]  (Id. at 83:1–3).  The pair then inspected the vehicles.  (Id. at 84:12–85:3, 88:17–19, 84:20–85:3, 91:10–12, 91:21–23, 29:2–5).

Mr. Coleman testified that the Cadillac sustained "[s]crapes down the side, bumps down the back side . . . like the back passenger door side, the bumper side, and the front part of [the] driving door, the bumper, also, down the side of the tires with like black scrapes[.]"  (ECF No. 68 at 29:6–10).  He said that there was "a dent" in the bumper and "some scrapes in it.  It detached from the quarter panel of the car."  (Id. at 29:11–19).  Mr. Martinez testified that he inspected the Cadillac for damage and "didn't see any damage.  What [he] did see was your normal wear and tear from an older vehicle."  (Id. at 84:15–24).  "[I]f I were to hit a vehicle with a 2-ton truck, you would definitely see some damages," Mr. Martinez testified.  (Id. at 86:17–20).

At the scene, Mr. Coleman took the following photographs, which he agreed "capture[d] all the damage to [the Cadillac] from the" March Accident:

---

[5] Mr. Coleman and Mr. Martinez offered contradictory testimony as to whether there was a passenger in Mr. Coleman's car or whether someone arrived to support Mr. Coleman after the March Accident occurred.  (Compare ECF No. 68 at 60:11–12, with id. at 84:8–16).  The presence, or absence, of this unidentified person does not impact our analysis.







(DX-G; ECF No. 68 at 55:9–56:18).  After the March Accident, Mr. Coleman did not have the Cadillac repaired, but "removed all of the scrapes" himself, and then had the Cadillac "towed" in February 2023, after he commenced this action.  (ECF No. 68 at 58:13–60:3).  Despite being confronted with his deposition testimony that "a random tow truck company" paid him $40 for the Cadillac, at trial Mr. Coleman denied that any sale occurred.  (Id. at 59:1–24; DX-Y at 105:23–106:8).

On cross-examination, Mr. Coleman subsequently admitted that before the March Accident there had been "minor" damage to the Cadillac's left rear wheel well, seen in this photograph that Mr. Coleman posted on his Instagram account on January 16, 2021:



(ECF No. 68 at 55:1–8, 72:8–16; DX-E).

Mr. Martinez inspected the Truck at 850 Jennings Street and "s[aw] [] no damage" to it.

(ECF No. 68 at 85:23–86:3).  A photograph of the Truck as it appeared in December 2021 appears

below:



(JX-3 at 4).  No repairs were performed on the body of the Truck between March 2021 and when

the photograph was taken.  (ECF No. 70 at 95:7–19).

After Mr. Coleman and Mr. Martinez spoke, Mr. Martinez called his supervisor, Mr. Williams. (ECF No. 68 at 85:5–16). Mr. Williams is stationed at the Southern Boulevard post office in the Bronx and has been a supervisor there for nearly eight years. (ECF No. 70 at 82:6–20). At about 5:40 p.m. on the date of the March Accident, Mr. Williams received the call from Mr. Martinez, who informed him that Mr. Martinez "stopped his truck at 850 Jennings Street and two gentlem[e]n approached him from a vehicle behind and said that a couple blocks or somewhat behind him he struck their car. He sideswiped their car." (Id. at 84:4–19). Mr. Williams told Mr. Martinez "to call 9-1-1" because Mr. Williams "just felt like there was just somebody trying to pull a fast one or something like that[,]" and then drove to the scene about five minutes later. (Id. at 84:23–85:10). Both Mr. Martinez and Mr. Williams "concluded that there was no damage[] done from a 2-ton truck." (ECF No. 68 at 85:23–86:1). Mr. Williams also confirmed that the minor damage visible in the January 2021 photograph resembled what he saw on the Cadillac at 850 Jennings. (ECF No. 70 at 88:24–89:5).

Mr. Williams testified that "[w]henever there's an accident, [USPS employees] have to do an investigation." (ECF No. 70 at 85:12–13). From Mr. Williams's vantage point, "there was no evidence to show that [the Cadillac] was sideswiped." (Id. at 86:11–14). When he arrived at the scene, Mr. Williams observed Mr. Coleman "pacing. He was walking up and down the sidewalk. He was also talking with his friend, and every once and a while he would say some stuff to us." (Id. at 87:19–21). Mr. Williams also took photos and a video at the scene on his personal cell phone but later erased them to free up space on his phone. (Id. at 88:2–23). Mr. Williams then called the police because he "wanted to have [the March Accident] documented." (Id. at 89:9–10).

When the police arrived, Mr. Williams recalled that Mr. Coleman "was pretty animated[,]" continuously "walk[ed] back and forth[,]" and "sa[id] a lot, but specifically he kept repeating that this was not over and that he had something for that ass—excuse me—along those lines." (ECF No. 70 at 89:24–90:2, 90:13–23).  When Mr. Williams left the scene, he "didn't feel like there was an accident" and thought that "the police did agree that what [Mr. Coleman] claimed was [not] true[.]"  (Id. at 103:5–16).  Mr. Williams did not observe Mr. Coleman walk with a limp, complain of pain or injury, or appear injured at the scene.  (Id. at 91:7–23).

Shortly after Mr. Williams called 9-1-1, at least two officers, one of whom was female, arrived at the scene.  (ECF No. 68 at 30:2–9, 86:2–9).  One of the NYPD officers was Officer Peralta, who joined the New York Police Department in January 2020.  (ECF No. 70 at 51:5–8, 52:8–23). She has been called to the scene of about a dozen sideswipe car accidents.  (Id. at 68:16–20).  She was on patrol on March 27, 2021 and received the dispatch to the scene of the March Accident around 6:00 p.m.  (Id. at 52:3–17).  At the scene, Officer Peralta first spoke to Mr. Martinez, who "inform[ed her] that it was an alleged accident and that he did [not] feel the collision."  (Id. at 53:22–23).  She then spoke to a person standing with Mr. Coleman, who told her that he was not in the Cadillac with Mr. Coleman but "informed [her] of what happened."  (Id. at 53:25–54:5, 54:11–15, 76:1–4).[6]  Officer Peralta then spoke to Mr. Coleman, who told her that "he had to move his car, and then when he left it parked, [] that's when the postal truck scratched his car." (Id. at 54:16–55:11).  Officer Peralta observed that Mr. Coleman "was upset" because he claimed that Officer Peralta didn't "like black people[,]" and thought Mr. Coleman was a "monster."  (Id.

---

[6] Mr. Coleman denied that anyone else was with him at the scene.  (Compare ECF No. 68 at 60:8–23, with id. at 84:7–16).

at 60:3–15, 75:21–25).  Mr. Coleman acknowledged that he "was a little upset" and had told the Officers he "was sitting in [his] car, the mail truck sideswiped [him], and [it] kind of kept going." (ECF No. 68 at 30:14–31:11).

Officer Peralta's supervisor arrived at the scene and directed her "to issue [Mr. Coleman] a summons for an unregistered vehicle[.]"  (ECF No. 70 at 56:16–21).  Consistent with police policy, she activated her body-worn camera ("BWC") when she issued Mr. Coleman the summons.  (Id. at 57:12–25; DX-H; DX-I).  The BWC footage shows Officer Peralta issuing the summons to Mr. Coleman while she gave him "information on how to obtain [his] vehicle report accident number."  (ECF No. 70 at 59:14–19).

Because the officers did not personally witness the March Accident and Mr. Martinez denied that any accident occurred, Officer Peralta and her colleague prepared an accident report describing "what Mr. Coleman informed" them at the scene.  (ECF No. 70 at 61:19–71:16, 66:10–12, 79:11–22).  Officer Peralta testified, and the police report indicates, that there was no damage to the Truck and that no one reported any injuries.  (Id. at 66:16–68:15, 71:12–16; JX-1 at 1 (noting "0" injuries)).  According to Officer Peralta, the Cadillac had "small damage near the back tire on the body of the car, maybe like minor scratches[,]" but "not like" the "long abrasions against the vehicle" reported in "usual sideswipes[,]" and that such damage was not "necessarily from the [A]ccident."  (ECF No. 70 at 68:13–69:3, 76:14–16).  Officer Peralta also agreed that the minor scratches on the Cadillac in the January 2021 Instagram post resembled the scratches on the car at the scene.  (Id. at 68:13–15, 69:4–23).

Mr. Coleman testified that he felt right knee pain at the scene, "a stiffness, a numbness, and a throbbing" together with "a tightness in the back area of [his] leg."  (ECF No. 68 at 33:11–

12

13).  He did not, however, make any complaints of pain to the officers or ask them to call an ambulance.  (Id. at 31:12–13, 33:4–7).  While on the scene, Officer Peralta did not observe Mr. Coleman experiencing any difficulty standing or walking at the scene, and she testified that Mr. Coleman made no statements about pain, injury, or the need for medical attention. (ECF No. 70 at 60:19–61:18, 70:9–13, 81:8–12).  Officer Peralta's bodycam video at the scene shows Mr. Coleman standing and walking without any limp or difficulty.  (DX-H; DX-I; ECF No. 70 at 59:14–60:25).  "No one complained of injuries" to the officers.  (ECF No. 70 at 71:12–16). Mr. Martinez testified that he was at the scene for "about an hour" and saw Mr. Coleman walking but did not observe him limp, touch or hold his right knee, or express that he was injured or in pain.  (ECF No. 68 at 88:2–89:16).  When he left the March Accident scene, Mr. Coleman drove the Cadillac home, "told [his] mom what had happened, drank some water, [and] took a Tylenol." (Id. at 33:23–34:8).

In December 2021, after Mr. Williams learned that Mr. Coleman commenced this action, Mr. Williams completed a USPS accident report.  (ECF No. 70 at 92:10–95:5, 94:21–95:6; DX-A; DX-B).  Mr. Williams had not filled out the report earlier because he "thought that there was no accident[.]"  (ECF No. 70 at 96:2–7).  Mr. Williams also prepared a written statement concerning his recollection of the March Accident and instructed Mr. Martinez to do the same.  (Id. at 94:6– 95:6; DX-C; DX-D).  Both statements briefly recount Mr. Williams's and Mr. Martinez's recollection of the events on March 27, 2021, and attest that no accident occurred.  (See DX-C; DX-D).[7]

_____

[7] Although Mr. Martinez's statement mentions possible extortion, Mr. Martinez testified that he did not inform the police that he "felt like [] a victim of extortion on the date of the [March A]ccident" and that

B.  **Events in April and May 2021**

A few weeks after the March Accident, Mr. Williams saw Mr. Coleman in a supermarket, walking around without a limp or signs of pain or injury.  (ECF No. 70 at 97:5–98:4).

On May 5, 2021, Mr. Coleman was in another car accident (the "May Accident"), which he described as "a light fender bender," to which the police and an ambulance responded. (ECF No. 68 at 35:9–19).  Mr. Coleman said that he told the paramedics about the March Accident and they later took him to the emergency room to "check [him] out."  (Id. at 35:22–36:6).  Mr. Coleman testified that he did not complain of right knee pain to medical personnel after the May Accident, and they did not examine his right knee at the hospital.  (Id. at 36:11–37:4).  At his deposition in 2023, however, Mr. Coleman denied having been in any car accidents other than the March Accident.  (Id. at 62:24–63:2).

C.  **Subsequent Events**

In 2023, Mr. Coleman applied to and was hired by the New York City Parks Department for a sanitation position, for which he confirmed that he was "willing and able to work 40 hours a week" and stand during eight-hour shifts.  (ECF No. 68 at 67:4–68:25; DX-X).  His job duties included cleaning bathrooms, picking up garbage, sweeping outside, spraying down trucks, raking grass, and cleaning gutters.  (ECF No. 68 at 69:1–13).  Mr. Coleman testified that his knee "bother[ed]" him during this employment.  (Id. at 71:6–8).

Mr. Coleman claimed that he does not "really go [] near" stairs since the March Accident. (ECF No. 68 at 71:22–24; see id. at 66:14–21).  Nicholas Cavalcanti, a special agent with the USPS

_____

he wrote his statement because Mr. Coleman commenced this action.  (DX-C; ECF No. 68 at 107:10–108:16).

Office of the Inspector General—who is responsible for conducting "criminal, civil, and administrative investigations[,]" including investigations relating to internal "fraud, waste, and abuse"—was instructed to "conduct surveillance" of Mr. Coleman on May 10, 2024.  (ECF No. 70 at 109:10–111:3).    Agent Cavalcanti received surveillance training at the Federal Law Enforcement Training Center in Brunswick, Georgia, where he was taught "to handle surveillance and equipment of that nature."  (Id. at 122:10–17).  Agent Cavalcanti recorded Mr. Coleman using an "agency-issued camcorder device" near Mr. Coleman's last known address.  (Id. at 111:4–20).  On May 10, 2024, between 9:00 a.m. and 11:15 a.m., Agent Cavalcanti observed Mr. Coleman walk about one-half mile without a limp and ascend "approximately three flights of stairs[,]" totaling about "40 steps in total[,]" at the Freeman Street subway stop.  (Id. at 112:22–118:11; DX-Z).[8]

### D.  **Mr. Coleman's Medical Treatment**

The week after the March Accident, Mr. Williams felt "a little stiffness and pain, and [his right knee] started to swell, so [he] knew something was definitely wrong."  (ECF No. 68 at 34:18–24).  That same week, Mr. Coleman contacted an attorney, who came to represent him in this action.  (Id. at 61:21–23).  Mr. Coleman testified that he did not "have any pain or restrictions in [his] right knee at any time before this [March A]ccident[.]"  (Id. at 35:3–5).  About ten days after the March Accident, on April 6, 2021, he first sought medical treatment and received a chiropractic evaluation.  (Id. at 37:17–20; DX-W ¶ 12; DW-R at USA-Medalliance-00015–20).

---

[8] The Court admitted the video over Mr. Coleman's objection, which he has since abandoned.  (ECF No. 70 at 121:7–14; DX-Z; see n.2, supra).

According to Mr. Coleman, at his first visit with a physician following the March Accident, he complained of "basic, common" troubles with "getting in and out of bed, lifting stuff off [his] legs, and tightness in" his legs.  (ECF No. 68 at 39:6–7).  He initially attended physical therapy "maybe once a week" at Medalliance and on April 26, 2021, received a Magnetic Resonance Imaging ("MRI") of the right knee.  (Id. at 39:14–41:4; DX-T at USA-Third Ave Imaging-00010–11 (the "First MRI Report"); DX-W ¶ 15; DX-K (the "First MRI Images")).  The First MRI Report contained five findings:

|   | **Radiological Finding** | **Lay Description** |
| --- | --- | --- |
| 1. | Bone infarct in the proximal tibia | Dead bone tissue in the upper part of the shinbone |
| 2. | Sprain of the posterior medial meniscal capsular junction with focal tearing of the medial meniscus inner margin | A sprain in the back and inner part of the knee where the meniscus connects, along with a small tear in the inner edge of the meniscus |
| 3. | High-grade chondral fissuring along the patellofemoral compartment with focal areas of subchondral edema | Severe degenerative cartilage cracks in the area where the kneecap and thigh bone meet, with small spots of swelling in the bone beneath the cartilage |
| 4. | Borderline patella alta | A developmental condition where the kneecap is located slightly higher than normal |
| 5. | Reactive joint effusion with trace Baker's cyst | A small amount of excess fluid in the joint, which can leak out the back of the knee and form a Baker's cyst |

(DX-T at USA Third Ave Imaging-00010–11; DX-W ¶ 15).

On May 5, 2021—same day as the May Accident—Mr. Coleman visited the office of Dr. Jeffrey Guttman, where he was seen by a physician assistant ("PA").  (DX-U USA-Countrywide at 02045–48).  Despite having been in a car accident earlier that day, Mr. Coleman referred only to the March Accident.  (Id. at USA-Countrywide-02045).  The PA diagnosed a right knee medial meniscal tear and recommended physical therapy and possible surgery.  (Id. at USA-Countrywide-

02048).  On May 19, 2021, Mr. Coleman saw Dr. Guttman and complained of "moderately severe, sharp, and localized" medial right knee pain that "worse[ned] with walking and twisting/turning." (Id. at USA-Countrywide-02126).  Again, Mr. Coleman referenced only the March Accident, not the May Accident.  (Id.)  Dr. Guttman noted inconsistent ranges of motion for Mr. Coleman's right knee, recording it in one section as 0 to 140 degrees—which he said was normal—but 0 to 120 degrees in another, without indicating whether this measurement was active or passive or was made with a goniometer.  (Id. at USA-Countrywide-02127; ECF No. 72 at 12:17–13:1).

On May 27, 2021, Dr. Guttman performed surgery on Mr. Coleman's right knee involving the following procedures (the "Arthroscopic Procedures"):

|   | Arthroscopic Procedure | Lay Description |
|---|---|---|
| 1. | Right knee medial, partial medial and lateral meniscectomies | Surgical removal of part of damaged cartilage on both the inner and outer sides of the right knee |
| 2. | Patella and trochlea chondroplasty | Procedure to smooth and remove damaged articular cartilage (i.e., cartilage lining the bone) on the kneecap (patella) and the groove in the thighbone where the kneecap moves (trochlea) |
| 3. | Removal of loose bodies | Procedure to remove pieces of bone or cartilage that are floating within a joint, which requires a separate incision into the joint |
| 4. | Major synovectomy | Procedure to remove a significant portion of the tissue lining a joint |

(DX-U at USA-Countrywide-02142–44; DX-W ¶ 23).

After the surgery Mr. Coleman walked with a cane for the next six to eight months and took pain medication as instructed.  (ECF No. 68 at 42:14–43:5).  On June 3, 2021, he saw Dr. Guttman's PA, who noted that Mr. Coleman was "doing well postoperatively" and was "controll[ing] his pain with anti-inflammatories[.]"  (DX-U at USA-Countrywide-00869).  On June 14, 2021, Mr. Coleman again saw Dr. Guttman's PA, who removed Mr. Coleman's sutures

and noted that he had a "history of multiple previous trauma and tends to be a poor historian." (DX-U at USA-Countrywide-00977). After the surgery, Mr. Coleman felt that his right knee had improved and resumed physical therapy on July 1, 2021, at Dr. Guttman's instruction. (ECF No. 68 at 43:14–44:3; DX-R at USA-Medalliance-00010–14).

On July 1, 2021, Mr. Coleman saw Dr. Guttman, who again noted two different ranges of motion for his right knee—0 to 140 degrees, and 10 to 100 degrees—and that Mr. Coleman had "great difficulty getting into full extension." (DX-U at USA-Countrywide-02132). Dr. Guttman informed Mr. Coleman about the importance of getting his knee into full extension, instructed him about exercises "that he should be doing on his [own] to work on this[,]" and prescribed physical therapy to begin right away. (Id.)

On August 12, 2021, a nurse practitioner at Tri-Borough Medical Practice examined Mr. Coleman, who complained of strain and weakness in his right knee and that he could not put pressure on it, (ECF No. 68 at 45:2–6), and found his range of motion to be 0 to 120 degrees, although it is unclear whether this measurement is active or passive and whether it was performed with a goniometer. (PX-6 at USA-Triborough-00013). Mr. Coleman was referred for physical therapy, along with pain, orthopedic, and chiropractic consultations. (Id. at USA-Triborough-00014).

On January 27, 2022, Mr. Coleman received another MRI of the right knee at Wellness Medical Imaging. (DX-O at USA-Wellness Med Imaging-00002–03 (the "Second MRI Report"); DX-W ¶ 30; PX-7 ¶ 14). The Second MRI Report included the following findings:

|    | 3T Radiological Findings | Lay Description |
|----|--------------------------|-----------------|
| 1. | Altered area of signal intensity in the proximal tibia which was a bone infarct | An altered signal in the upper part of the shinbone, identified as dead bone tissue |

| 2. | Intrasubstance signal in the body of the posterior horn of the medial meniscus as well as posterior horn of the lateral meniscus which may represent an intrasubstance tear of myxoid change | Changes within the posterior parts of both the inner and outer menisci, which are not indicative of a tear and do not cause symptoms |
| 3. | Grade 1 sprain medial collateral ligament | The most mild form of ligament injury, impacting the ligament in the inner part of the knee |
| 4. | Minimal synovial effusion | A small amount of fluid in the joint |
| 5. | Mild changes of osteoarthritis in the knee joint | Degenerative arthritis in the knee joint |
| 6. | Chondromalacia patella grade 1 | Mild, degenerative cartilage softening under the kneecap |
| 7. | Mild subcutaneous edema around the knee joint | Slight swelling in the soft tissue around the knee joint |

(DX-W ¶ 30; DX-O at USA-Wellness Med Imaging-00002–03).

On December 14, 2022, after he filed this action, Mr. Coleman was seen by Dr. Kenneth McCullough, who shares an office with Dr. Kevin Wright, Mr. Coleman's expert. (ECF Nos. 68 at 67:1–3; 72 at 4:4–5; PX-4 at USA-McCulloch-00005–06). Mr. Coleman stated that his right knee pain "worsened with the surgical intervention" and was severe during "all activities including standing, walking, stairs, twisting," kneeling, and squatting. (PX-4 at USA-McCulloch-00005). He described "dysfunction" during the daily activities of cleaning, grooming, and making his bed. (Id.)

On January 19, 2023, Mr. Coleman received a high-quality 3 Tesla ("3T") MRI of the right knee. (DX-N at USA-Zwanger-Pesiri Radiology-00010–11 (the "Third MRI Report")). The Third MRI Report included the following findings:

| | **3T Radiological Findings** | **Lay Description** |
| 1. | Partial thickness cartilage loss | The cartilage covering the joint has been partially worn away, but it has not been completely lost |

| 2. | Deep chondral fissuring of the lateral patellar facet with subchondral cystic changes | Deep cracks in the articular cartilage on the outer side of the kneecap, along with small fluid-filled pockets forming in the bone beneath the damaged cartilage |
| 3. | Full thickness cartilage loss along the lateral aspect of the trochlear groove | Complete loss of cartilage on the outer side of the trochlear groove, the part of the thighbone where the kneecap glides |

(DX-W ¶ 34; DX-N at USA-Zwanger-Pesiri Radiology-00010–11).  The Third MRI Report noted that

Mr. Coleman's lateral and medial menisci were "intact."  (DX-N at USA-Zwanger-Pesiri Radiology-

00010).

After the Third MRI Report, four months passed when "it seemed like [Mr. Coleman's

right knee] was getting a little better, just a little[.]"  (ECF No. 68 at 45:15–23).  He continued

physical therapy at Tri-Borough for eleven months and then stopped on his own, although he

continued doing home exercises and using creams.  (Id. at 45:24–46:14).

On December 8, 2023, Dr. Wright, Dr. McCulloch's partner and Mr. Coleman's expert,

examined him for 15 to 20 minutes.  (ECF No. 72 at 3:21–4:3, 18:10–22; DX-AA at 41; PX-7 ¶ 7;

PX-4 at McCulloch - Page 14–15; see § II.D.1, infra).  After Dr. Wright's examination in

December 2023, Mr. Coleman did not receive any other medical treatment or take any

medications for his knee.  (ECF No. 68 at 51:24–25, 66:22–25).  Mr. Coleman testified that

"[w]alking moderate distance is not difficult for" him, he can "walk a quarter mile without

difficulty" but will feel pain if he "walk[s] a half mile[.]"  (Id. at 63:15–65:13).  Mr. Coleman

testified that climbing stairs has not "been an ongoing problem" and he can walk a few stairs but

not "[m]ultiple flights."  (Id. at 65:18–66:21).

1. **Expert Testimony**[9]

### Mr. Coleman's Expert, Dr. Wright

Dr. Wright is an orthopedist in private practice at New York Sports & Joints whose subspecialty is "upper extremity injuries" and who performs several knee surgeries each week. (PX-7 ¶ 5).  He testifies once or twice per week in workers' compensation proceedings and regularly testifies for plaintiffs in litigation.  (ECF No. 72 at 9:6–14).

Dr. Wright examined Mr. Coleman once, on December 8, 2023, for approximately 15 to 20 minutes and prescribed Mr. Coleman physical therapy, topical diclofenac sodium, a knee brace and an appointment to return in 10 weeks for a clinical evaluation, "which [Mr. Coleman] did not keep."  (ECF No. 72 at 18:10–19:14; PX-7 ¶ 7; PX-4 at McCulloch - Page 14–15).  Dr. Wright calculated that his right knee range of motion was 10 to 90 degrees with pain—with normal being 0 to 150 degrees—although he did not document whether that measurement was active or passive.  (PX-4 at McCulloch - Page 14–15; PX-7 ¶ 12; ECF No. 72 at 10:19–11:6, 13:2–14, 54:8–20).  Dr. Wright focused solely on Mr. Coleman's right knee and its range of motion, and he did not compare it to or take any measurements of the left knee.  (ECF No. 72 at 59:4–15).

Dr. Wright reviewed the First MRI Report—but not the images themselves—and declared that Mr. Coleman displayed a "[s]prain of the posterior medial meniscal junction with focal

---

[9] Although Federal Rule of Civil Procedure 43(a) requires trial witnesses' testimony to "be taken in open court" unless a federal statute or rule permits otherwise, Fed. R. Civ. P. 43(a), the Second Circuit has approved "the procedure allowing the parties to produce direct evidence from their witnesses in writing while permitting subsequent oral cross-examination—particularly when the parties agree to that procedure in advance." Ball v. Interoceanica Corp., 71 F.3d 73, 77 (2d Cir. 1995).  The Court followed this procedure here as to the experts' testimony, with notice to and consent of the parties.  (ECF Nos. 56 at 2; 57 at ¶¶ 8.A.2, 8.B.4, 8.B.5, 9; 59 at ¶¶ 8.A.2, 8.B.4, 8.B.5, 9; 65).  See Cabrera v. United States, No. 18 Civ. 7270 (SDA), 2020 WL 5992929, at *9–10 (S.D.N.Y. Oct. 9, 2020) (at FTCA bench trial, accepting experts' testimony by declaration with in-court cross-examination).

tearing of the medial meniscus inner margin." (ECF No. 72 at 6:8–10; PX-7 ¶ 14). That sprain, according to Dr. Wright, "can be caused by a minor motor vehicle accident." (PX-7 ¶ 14). After reviewing the Second MRI Report, Dr. Wright observed what "may be a tear, or it may just be a signal of various rating." (Id.) Dr. Wright noted that "to know for sure, it could be evaluated during surgery." (Id.) Dr. Wright also reviewed the Third MRI Report and observed that "[t]he meniscal tears were addressed during surgical intervention. The cartilage was operated on during the surgical intervention, but despite this, the cartilage damage persists, which is one of the reasons the patient is having persistent pain in his right knee[]. With a reasonable degree of medical certainty, the motor vehicle accident exacerbated and/or caused that condition[.]" (Id.) Dr. Wright noted that Mr. Coleman "made no complaints of any knee pain in the emergency room" after the May Accident, so Dr. Wright opined that he does "not believe that the May [] [A]ccident impacted [Mr. Coleman's] right knee nor caused any trauma to his right knee." (Id. at ¶ 13). Dr. Wright acknowledged, however, that he did not know the details of the May Accident. (ECF No. 72 at 45:10–16). Dr. Wright opined that "Mr. Coleman would benefit from additional treatment including physical therapy and analgesic medication as needed" and that Mr. Coleman "still suffers from persistent pain and dysfunction that affects his ability to perform his activities of daily living." (PX-7 ¶¶ 19–20).

At trial, Dr. Wright testified that his PA examined Mr. Coleman on January 24, 2025. (ECF No. 72 at 4:7–22). Dr. Wright testified that the PA found a decreased range of motion in both of Mr. Coleman's knees, crepitus with motion of the knees, tenderness to palpitation on the

medical joint line and lateral joint lines of both knees, a positive Murray's test, tenderness behind the patella, and weakness in both knees.  (Id.)

Dr. Wright testified further that (i) he does not specialize in treating knee injuries, (ii) his opinion that the March Accident caused Mr. Coleman's knee injury is based on what Mr. Coleman reported to him, and (iii) he did not review the First MRI Images.  (ECF No. 72 at 8:25–9:2, 29:20–30:2, 34:10–25).  Dr. Wright testified that he did not know which, if any, medication Mr. Coleman was currently taking, whether he attended physical therapy either before or after his surgery, or whether he ever received injections to his right knee.  (Id. at 20:12–23:9).  Although Dr. Wright testified that he believed the damage to Mr. Coleman's knee depicted in arthroscopic pictures was caused by the March Accident, he confirmed that his opinion was based on the history that Mr. Coleman provided to him.  (Id. at 34:19–25).

Based on his review of Dr. Guttman's post-operative report (JX-2 at USA-Avicenna-00035–38), Dr. Wright testified that: (i) after the First MRI Report, no imaging showed the existence of a sprain to Mr. Coleman's lower extremities, (ii) Dr. Guttman did not treat a sprain during the surgery, but (iii) Dr. Guttman observed a tear of the posterior horn of the medial meniscus in Mr. Coleman's right knee, not the medial meniscus inner margin referenced in the First MRI Report.  (ECF No. 72 at 35:1–36; JX-2 at USA-Avicenna-00035–38).  Dr. Wright opined that the March Accident necessitated the surgery that Dr. Guttman performed (PX-7 ¶ 17), but

acknowledged that he did not have information about any treatment Mr. Coleman received before resorting to surgery.  (ECF No. 72 at 21:15–23:16).

### The Government's Experts

#### i.    Dr. Joseph Bosco

Dr. Joseph Bosco is a board-certified orthopedic specialist in the Department of Orthopedic Surgery at New York University Langone Medical Center and a Professor in the Department of Orthopedic Surgery at New York University Langone Health. (DX-W ¶¶ 4–6).  Dr. Bosco primarily treats patients with shoulder and lower extremity conditions. (DX-W ¶¶ 4–6).  In 30 years of practice, Dr. Bosco has performed over 6,000 knee surgeries, including thousands of arthroscopic meniscectomies and anterior cruciate ligament reconstructions.  (Id. at ¶ 6).  In his clinical practice, he regularly reviews MRIs of knee injuries and conditions.  (Id.)  He has been qualified and testified as an expert on fewer than ten occasions for both plaintiffs and defendants.  (Id. at ¶ 8).

On June 16, 2023, Dr. Bosco examined Mr. Coleman, measuring his right and left knees with a goniometer and finding an active-assisted range of motion of 0 to 130 degrees on his right knee and 0 to 135 degrees on his left.  (DX-W ¶¶ 35–38).  Based on Mr. Coleman's characteristics, including his age and weight, Dr. Bosco assessed that 0 to 130 or 135 degrees was normal. (ECF No. 72 at 69:17–70:6).  Dr. Bosco observed no evidence of weakness in either of Mr. Coleman's knees and assessed his quad muscle strength in both legs as 5/5.  (DX-W ¶ 45).

Based on his examination and review of the medical records, Dr. Bosco concluded that: (i) Mr. Coleman "did not sustain a serious or permanent injury to his [right] knee as a result of the [March A]ccident"; (ii) Mr. Coleman "does not have any limitations on the activities of daily

living that would arise from his alleged [March Accident,]"; and (iii) "[a]ny surgery [Mr. Coleman] has had on his knee cannot be causally related to [the March Accident]."  (DX-W ¶¶ 1, 9, 46).

### a.  Evaluation of the First MRI Report

Dr. Bosco opined that the First MRI Images did not substantiate the findings in the First MRI Report associated with traumatic injury.  (DX-W ¶ 47).  As to the first finding—bone infarct in the proximal tibia—and the fourth finding—borderline patella alta—Dr. Bosco explained that both are pre-existing non-traumatic conditions, which, he noted, Dr. Wright also did not link to the March Accident.  (DX-T at USA-Third Ave Imaging-00010–11; DX-W ¶¶ 51–53, 58–59; ECF No. 72 at 33:7–23, 40:19–25).

As to the second finding—sprain of the posterior medial meniscal capsular junction with focal tearing of the medial meniscus inner margin—Dr. Bosco explained that, based on his review of the First MRI images, this finding was erroneous because neither a sprain nor a meniscal tearing was visible in the images.  (DX-T at USA-Third Ave Imaging-00010–11; DX-W ¶ 54).  As to the sprain, Dr. Wright had conceded that his diagnosis of a sprain caused by the March Accident was based solely on Mr. Coleman's statements, and that, if he had a sprain, it would have healed "in time."  (ECF No. 72 at 34:3–35:12).  As to the medial meniscus tear, Dr. Bosco explained what a tear would look like and that the First MRI images did not exhibit any such tear.  (Id. at 76:2–78:18; DX-W ¶¶ 54-55; Def. Demo. Exs. A–B).

As to the third finding—high-grade chondral fissuring about the patellofemoral compartment with focal areas of subchondral edema—Dr. Bosco largely agreed with this

finding,[10] but noted that it "is a degenerative condition caused by the wearing down of articular cartilage of the undersurface of the patella and femur" and "cannot be caused by an acute traumatic event like a motor vehicle accident."  (DX-T at USA-Third Ave Imaging-00010–11; DX-W ¶¶ 56–57).  Dr. Wright had admitted that he had not reviewed the First MRI images and that the cartilage damage could have been pre-existing, and that he based his finding of causation on Mr. Coleman's statements.  (ECF No. 72 at 28:13–15, 39:14–40:25).

As to the fifth finding—reactive joint effusion with trace Baker's cyst—Dr. Bosco explained that the First MRI images showed no clinically significant Baker's cyst and any miniscule cyst would not be symptomatic or caused by trauma.  (DX-T at USA-Third Ave Imaging-00010–11; DX-W ¶¶ 60–61; ECF No. 72 at 83:17–84:8).

### b.  Evaluation of Arthroscopic Procedures

Dr. Bosco reviewed the report and images of the Arthroscopic Procedures that Dr. Guttman performed on Mr. Coleman on May 27, 2021, and opined that the surgery was not clinically indicated because he had a degenerative, non-traumatic condition and that the procedures did not repair any traumatic injuries in his right knee.  (JX-2; DX-W ¶¶ 48, 65; ECF No. 72 at 120:25–121:11, 125:13–126:22).

As for the first Arthroscopic Procedure—right knee partial medial and lateral meniscectomies—Dr. Bosco explained that neither the First MRI Report nor the surgical images showed a lateral or medial meniscus tear so Dr. Guttman did not perform—and could not have performed—any meaningful meniscectomy.  (JX-2 at USA-Avicenna-00035–38; ECF No. 72 at

---

[10] Dr. Bosco testified that he agreed that there were "some abnormalities of the articular cartilage of the patellofemoral joint, but [did] not characterize it as high grade."  (ECF No. 72 at 78:19–79:10).

88:4–90:25, 104:6–24; DX-W ¶¶ 69, 83).  Dr. Bosco also noted that Dr. Wright, in his report, inexplicably mixed up the lateral and medial meniscus in Mr. Coleman's surgical images. (ECF No. 72 at 93:10–94:9; DX-W ¶¶ 84–87; PX-7 ¶ 18).  In addition, Dr. Bosco explained that a clinically meaningful meniscectomy involves permanent removal of the meniscus, such that subsequent imaging would not show a normal intact meniscus, which the Second MRI Report and Third MRI Report showed for Mr. Coleman.  (ECF No. 72 at 104:8–24; DX-W ¶¶ 30, 34, 83; see ECF No. 72 at 42:20–43:4; DX-O at USA-Wellness Med Imaging-00002–03; DX-N at USA-Zwenger-Pesiri Radiology-00010–11).  Finally, Dr. Bosco explained that patients who tear their meniscus begin to limp immediately, but there is no evidence that Mr. Coleman limped after the March Accident.  (ECF No. 72 at 106:7–18, 123:5–9).

As for the second Arthroscopic Procedure—patella and trochlea chondroplasty—Dr. Bosco testified that the operative images did not show Dr. Guttman's diagnosis to justify this procedure—grade three chondral lesions on the undersurface of the patella and on the trochlea—and, in any event, this is a degenerative, not a traumatic, condition.  (JX-2 at USA-Avicenna-00035–38; ECF No. 72 at 87:7–19).

As for the third Arthroscopic Procedure—removal of loose bodies—Dr. Bosco explained that the First MRI images showed no clinically significant loose bodies.  (JX-2 at USA-Avicenna-00035–38; DX-W ¶¶ 89–90; ECF No. 72 at 96:14–99:5).  While Dr. Bosco observed in the operative images "small flecks of unattached tissue," he opined that no reasonable orthopedic surgeon would classify them as loose bodies, remove them surgically, or opine that they were caused by trauma.  (ECF No. 72 at 96:14–99:5; DX-W ¶¶ 70–71, 89–90).

As for the fourth Arthroscopic Procedure—major synovectomy—Dr. Bosco demonstrated what true synovitis looks like—reddish, inflamed lining of the knee joint—and that it was not visible in Mr. Coleman's operative images, which showed normal synovium.  (JX-2 at USA-Avicenna-00035–38; DX-W ¶¶ 72–74; ECF No. 72 at 99:20–101:9).

Accordingly, Dr. Bosco opined that the March Accident "could not have seriously or permanently injure[d] [Mr. Coleman's] knee[,]" that Mr. Coleman does not have limitations on the activities of daily living arising from the March Accident, and the surgery was not "causally related" to the March Accident.  (DX-W ¶ 91).

### ii.    Dr. David J. Bizzak

The Government's accident reconstruction expert, Dr. David J. Bizzak, holds a B.S. in mechanical engineering from Texas A&M University and a Ph.D. and M.S. in mechanical engineering from Carnegie Mellon University.  (DX-V ¶ 3).[11]  He has taught graduate-level engineering courses at the University of Pittsburgh and has 40 years of experience as a consulting engineer.  (Id.)  He is principal of the forensic engineering firm, Romualdi, Davidson & Associates.  (Id.)  Over his career, he has reconstructed more than 900 traffic accidents and opined on the severity of low-speed collisions and their potential to cause injuries.  (Id.)  In addition to reviewing the discovery produced in this action, in February 2023, Dr. Bizzak inspected and took measurements at the intersection of Freeman and Chisolm Street and examined the Truck. (Id. at ¶¶ 4–5; ECF No. 70 at 8:8–17).  He did not speak to any of the parties in the case and relied on deposition testimony.  (ECF No. 70 at 7:20–22).  He requested any collision repair or

---

[11] Mr. Coleman did not challenge Dr. Bizzak's qualifications or offer a rebuttal expert.  (ECF No. 70 at 6–36).

maintenance records for the Truck, but there were no indications of any repairs.  (Id. at 13:6–14).

Based on these efforts, Dr. Bizzak opined that "the physical evidence demonstrates that the

[March Accident] did not happen.  If one were to ignore this evidence and assume that an

accident did occur, the force generated would have been negligible."  (DX-V ¶ 2).

### a.   Dimensions of the Vehicles

Dr. Bizzak explained that the front of the Truck is narrower than the rear.  (DX-V ¶ 15).

The front track—from the outside edges of the tires—is 73.5 inches, while the rear track is 91

inches.  (Id.)  The widest part of the Truck is at the plastic fender flares on the rear wheel well,

which extend three (3) inches outward from the body of the Truck:



(DX-V ¶ 15 (Photograph 7)).  The lower edge of the wheel fender flares is 19 inches above the

ground and the top of the flares is 40 inches above the ground.  (DX-V ¶ 15).  In addition, the

Truck's front and back tires are recessed inward—i.e., are set inside the Truck walls—from the front and rear wheel wells.  (Id.)

As to the Cadillac, the top of the front bumper cover—which is situated below the fender at the front wheel well—is 25.5 inches above the ground:



(DX-V ¶ 19 (Photograph 8)). [12]

### b.  Dr. Bizzak's Opinions

Dr. Bizzak proffered four reasons for concluding that the physical evidence did not support Mr. Coleman's assertion that the Truck caused the damage to his Cadillac and that the March Accident did not, in fact, occur.  (DX-V ¶¶ 22–26).

---

[12] Because Mr. Coleman had disposed of the Cadillac on February 2, 2023, Dr. Bizzak was unable to inspect it and instead analyzed a three-dimensional model of a 2009 Cadillac CTS using FARO Zone 3D software, shown in this photograph.  (DX-V ¶¶ 17, 19).  Mr. Coleman did not object to this photograph.  (ECF No. 59 at 11).

First, Dr. Bizzak opined that, because of the dimensions of the Truck and the Cadillac, "it is not plausible that the damage to [the] Cadillac was caused by a side swipe collision with the [Truck]."  (DX-V ¶ 23).  Dr. Bizzak based his opinion on the facts that: (1) there was no visible damage to the Cadillac's front fender, despite the bumper being displaced; (2) the only component on the Truck that could have contacted the Cadillac's front bumper cover without contacting the front fender was the Truck's front bumper, which showed no evidence of damage; (3) if the Truck had contacted the Cadillac's front bumper, then the rear (wider) portion of the Truck would also have had to contact the Cadillac as it drove past, but there is no evidence of such damage; and (4) the Truck could not have caused the black transfer mark on the Cadillac's front left wheel without also damaging the Cadillac's front fender and side more broadly, because the Truck's wheels are recessed inward from the sides.  (DX-V ¶ 23; see ECF No. 70 at 24:2–27:18, 39:1–41:17, 49:1–23; DX-G; DX-J).

Second, comparing the January 2021 Instagram photograph (DX-J (Photograph 5)) with the photograph Mr. Coleman took at the scene of the March Accident (DX-J (Photograph 3)), Dr. Bizzak concluded that both photographs depicted the same damage to the same area of the Cadillac—the rear driver's side wheel well—and because the Instagram post predated the March Accident, it was therefore not plausible that the March Accident caused the damage.  (DX-V ¶ 24).

Third, Dr. Bizzak concluded that Mr. Coleman's description of his movement in the Cadillac on impact was "inconsistent with basic physics."  (DX-V ¶ 25).  Mr. Coleman testified that his body moved forward and toward the passenger (right) side of the Cadillac.  (Id. at ¶¶ 10, 25). Dr. Bizzak explained, however, that when a vehicle is struck by a passing vehicle on the driver's side, the stopped vehicle will move forward and to the right, and seated occupants would move

toward the rear driver's (left) side—the opposite of the direction that Mr. Coleman testified his body moved. (Id. at ¶ 25; ECF No. 70 at 42:9–15).

Fourth, Dr. Bizzak opined that, even if, contrary to the physical evidence, the Truck side swiped the Cadillac, "the force generated would have been minimal." (DX-V ¶ 26). Here, the damage to the Cadillac was cosmetic and the impact on Mr. Coleman "would have been negligible." (Id.; see ECF No. 70 at 42:16–23).

### E. Procedural History

On July 13, 2022, Mr. Coleman filed the Complaint, which seeks to hold the Government liable under the FTCA. (ECF No. 4). On November 16, 2022, the Government filed its Answer. (ECF No. 14). The parties consented to Magistrate Judge jurisdiction and the Court held a three-day bench trial from May 12–14, 2025. (ECF Nos. 53; 68; 70; 72; ECF min. entries May 12–14, 2025). At trial, after Mr. Coleman's final witness, the Government moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c), which the Court denied without prejudice to renewal after trial. (ECF Nos. 67; 72 at 62:23–65:10, 66:15–67:11). After trial, the parties submitted proposed findings of fact and conclusions of law. (ECF Nos. 75; 76).

### III. CONCLUSIONS OF LAW

### A. Legal Standards

#### 1. FTCA

The FTCA makes the United States liable for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or

omission occurred." 28 U.S.C. § 1346(b)(1). The FTCA applies here because Mr. Martinez was an

employee of the United States acting within the scope of his employment on March 27, 2021.

(ECF No. 59 at 6 ¶ 7.8). In an action under the FTCA, "courts are bound to apply the law of the

state . . . where the [tort] occurred." Makarova v. United States, 201 F.3d 110, 114 (2d Cir. 2001);

see 28 U.S.C. § 1346(b)(1).[13]

### 2. **New York Law**

The events at issue here occurred in New York, so New York law applies to Mr. Coleman's

claim. (ECF No. 59 at 6 ¶ 7.10). See Chen v. United States, 854 F.2d 622, 626 (2d Cir. 1988);

Holland v. United States, 918 F. Supp. 87, 89 (S.D.N.Y. 1996).

### **Negligence**

To establish negligence under New York law, a plaintiff bears the burden to establish by

a preponderance of the evidence that there was "(1) a duty owed by the defendant to the

plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." Solomon v. City

of New York, 66 N.Y.2d 1026, 1027 (1985); Aegis Ins. Servs., Inc. v. 7 World Trade Co. L.P., 737

F.3d 166, 177 (2d Cir. 2013). The plaintiff must also prove by a preponderance of the evidence

that he is entitled to recover damages. Craig Test Boring Co. v. Saudi Arabian Airlines Corp., 138

F. Supp. 2d 553, 557 (S.D.N.Y. 2001).

### **No-Fault Law**

New York's Comprehensive Motor Vehicle Insurance Reparations Act, N.Y. Ins. L. § 5101

et seq. (the "No-Fault Law"), "requires the insurer of any vehicle owner to pay benefits to

---

[13] Internal citations and quotation marks are omitted from case citations unless otherwise indicated.

'[p]ersons, other than occupants of another motor vehicle or a motorcycle, for loss arising out of the use or operation in this state of such motor vehicle.'" Rosa v. Allstate Ins. Co., 981 F.2d 669, 676 (2d Cir. 1992) (quoting N.Y. Ins. L. § 5103(a)(1)). The No-Fault Law "makes a broad category of affected persons[,]" including the occupant of the insured vehicle—"'covered' person[s] . . . entitled to 'first party benefits' by force of law." Id. (quoting N.Y. Ins. L. §§ 5102(j), 5103(a)). The No-Fault Law "guarantees prompt and full compensation for economic losses up to $50,000 without the necessity of recourse to the courts and simultaneously eliminates recovery for non-economic losses (i.e., pain and suffering) in relatively minor cases." Patrello v. United States, 757 F. Supp. 216, 219 (S.D.N.Y. 1991) (citing Montgomery v. Daniels, 38 N.Y.2d 41, 55 (1975)).

The No-Fault Law applies to "any action by or on behalf of a covered person against another covered person for personal injuries arising out of negligence in the use or operation of a motor vehicle in [New York]." N.Y. Ins. L. § 5104(a). A threshold question, then, in applying the No-Fault Law is whether both the plaintiff and the defendant are "covered persons" as defined in § 5102(j). Patrello, 757 F. Supp. at 219–20; accord Torres v. Mamadou, No. 19 Civ. 6973 (SLC), 2022 WL 10375005, at *6–7 (S.D.N.Y. Oct. 18, 2022). Here, the parties have stipulated that Mr. Coleman and the United States are each a "covered person" under the No-Fault Law. (ECF No. 59 at 6 ¶¶ 7.7, 7.9).

The No-Fault Law has a "two-pronged nature." Patrello, 757 F. Supp. at 219. First, "[Section] 5103 requires insurers to compensate accident victims for their 'basic economic loss' on account of personal injury by promptly distributing what are termed 'first party benefits' without regard to fault." Id. "'Basic economic loss' essentially consists of medical expenses, loss

of earnings and other 'reasonable and necessary' expenses up to $50,000 per person." Id. (citing N.Y. Ins. L. § 5102(a)). Under the No-Fault Law, "first party benefits" refers to reimbursement to the accident victim for the basic economic loss less certain deductions. Id. (citing N.Y. Ins. L. § 5102(b)).

Second, the No-Fault Law "imposes two limitations on tort recovery for personal injuries in actions between 'covered persons[.]'" See Patrello, 757 F. Supp. at 219 (citing N.Y. Ins. L. § 5104). The first recovery limitation is that "the injured party may not duplicate recovery of first party benefits but may recover in tort only that basic economic loss which exceeds $50,000." Id. The second limitation is that recovery for "non-economic loss," i.e., pain and suffering, "is limited to that associated with 'serious injury' as defined in § 5102(d)." Id. The purpose of these limitations is to:

> guarantee[] full and fair recovery to all victims by reducing pressure on a seriously injured person to compromise down his claims in order to obtain funds for treatment while at the same time eliminating pressure on insurers to compromise up claims by persons suffering minor injuries in order to avoid the expense of investigating and defending against such minor claims.

Id. (citing Montgomery, 38 N.Y.2d at 55). The implicit "trade-off" for covered persons under the No-Fault Law is that "in exchange for their entitlement to prompt payment of first party benefits under § 5103 without regard to fault, covered persons must also accept § 5104's tort recovery limitations in actions against other covered persons." Patrello, 757 F. Supp. at 219.

As noted above, under the No-Fault Law, there is "no right of recovery for non-economic loss, except in the case of a serious injury," N.Y. Ins. L. § 5104(a), which is:

> a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of a use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury

35

> or impairment of a non-permanent nature which prevents the person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred and eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins. L. § 5102(d).   "[T]o qualify as a serious injury within the meaning of the statute, 'permanent loss of use' must be total."  Oberly v. Bangs Ambulance Inc., 96 N.Y.2d 295, 298 (2001).  Determining whether the limitation on the use of a bodily function is "consequential" or "significant" requires evaluation of the qualitative nature of the injury in relation to the normal function, purpose and use of the body part.  Toure v. Avis Rent A Car Sys., Inc., 98 N.Y. 2d 345, 353 (2002).  A "minor, mild, or slight limitation" does not qualify as a serious injury.  Licari v. Elliott, 57 N.Y.2d 230, 236 (1982).

To establish a "serious injury," a plaintiff must come forward with "objective medical evidence[.]"  Williams v. United States, 597 F. App'x 647, 649 (2d Cir. 2015); Toure, 98 N.Y.2d at 353 (explaining that plaintiff must adduce medical reports detailing injury based on objective medical determinations).  "Objective medical evidence can include diagnostic tests (such as an EMG or MRI), or a numeric assessment of lost range of motion."  Madden v. Lee, No. 01 Civ. 7856 (GWG), 2002 WL 31398951, at *4 (S.D.N.Y. Oct. 25, 2002).  "A plaintiff's mere subjective reports of pain, numbness or other symptoms are not sufficient to demonstrate 'serious injury.'"  Cabrera, 2020 WL 5992929, at *13 (quoting Toure, 98 N.Y.2d at 350).  The plaintiff bears the burden of proof to show that he has suffered a "serious injury" within the meaning of § 5102(d).  Toure, 98 N.Y.2d at 350; Krynski v. Chase, No. 06 Civ. 4766 (AMD) (VMS), 2016 WL 1029498, at *4–5 (E.D.N.Y. Mar. 8, 2016), aff'd, 677 F. App'x 24 (2d Cir. 2017).  "The Court has discretion to determine the credibility of the testimony of the [p]laintiff and any medical experts regarding [his] injuries."  Cabrera, 2020 WL 5992929, at *13 (citing Williams, 597 F. App'x at 648–49).

Finally, "in auto accident cases, a 'plaintiff is required to present nonconclusory expert evidence sufficient to support a finding . . . that the injury was causally related to the accident.'" Alim v. United States, No. 21 Civ. 2234 (LJL), 2023 WL 2929380, at *20 (S.D.N.Y. Apr. 13, 2023) (quoting Diaz v. Anasco, 38 A.D.3d 295, 296 (1st Dep't 2007)); accord Naramuchi v. Am. Home Assur. Co., 317 F. App'x 56, 58 (2d Cir. 2009). A plaintiff's self-serving testimony "is insufficient as a matter of law to raise a triable issue of proximate causation." Watson-Tobah v. Royal Moving & Storage, Inc., No. 13 Civ. 7483 (KBF), 2014 WL 6865713, at *14 (S.D.N.Y. Dec. 5, 2014).

### B. Application

#### 1. Negligence

Based on the totality of the evidence, whether the March Accident even occurred is, at best, inconclusive. The only evidence to support Mr. Coleman's theory of negligence is his own testimony and that of his medical expert, Dr. Wright, who admitted multiple times that his opinions were based on Mr. Coleman's description of what happened. (ECF No. 72 at 5:8–22, 25:3–9, 46:17–19, 58:12–17). No other evidence meaningfully corroborates Mr. Coleman's testimony about the March Accident.

First, Mr. Coleman's Instagram post shows that the damage he claims the Truck caused existed at least two months before the March Accident. (Compare DX-E, with DX-G). This is persuasive evidence that any damage to the Cadillac was preexisting and not caused by the Government. See Watson-Tobah, 2014 WL 6865713, at *12–13 (discussing evidence that plaintiff's alleged injuries were preexisting). Given that the Cadillac was not damaged in the March Accident, it follows that Mr. Coleman similarly was not injured.

Second, Mr. Coleman's own descriptions of the March Accident are inconsistent. On direct examination, Mr. Coleman said he was "looking down . . . toward the console area" of the Cadillac. (ECF No. 68 at 24:14–17). When he felt the impact, he "looked up" and saw "a whitish truck moving past [him]." (Id. at 24:18–21). Questioned by the Court later, however, Mr. Coleman first said he looked up "to the front," but then later said he "looked over to the side" and "it was dark." (Id. at 73:9–23). These inconsistencies in Mr. Coleman's own description of the impact undermine the credibility of his account. See Alim, 2023 WL 2929380, at *18 (discrediting plaintiff's description of accident due to "inconsistencies").

Third, to the extent that other witnesses referenced a Sideswipe, each testified that they based their reports on what Mr. Coleman told them, not their own observations. Officer Peralta recorded in the police report exactly what Mr. Coleman told her: "that he was in his parked car" when the Truck "side swiped his car." (JX-1 at 1; ECF No. 70 at 63:11–15 ("All of the information would have been based off of what Mr. Coleman informed us."), 66:10–12 (diagram was "based on Mr. Coleman's statements")). Similarly, after Mr. Martinez stopped the Truck at 850 Jennings, Mr. Coleman told Mr. Martinez—who subsequently told Mr. Williams—that the Truck had "sideswiped" the Cadillac. (ECF Nos. 68 at 82:8–10, 83:1–3, 84:12–16; 70 at 84:15–19). Notwithstanding Mr. Coleman's description, Officer Peralta, Mr. Martinez, and Mr. Williams, each testified that they did not observe damage caused by the alleged Sideswipe to either the Truck or the Cadillac, and they did not witness Mr. Coleman experience pain or difficulty with mobility at the scene. (ECF Nos. 68 at 84:12–24; 70 at 66:16–17, 86:10–14). We credit their testimony, which is in tension with or outright contradicts Mr. Coleman's self-serving and self-

contradictory testimony.  See Alim, 2023 WL 2929380, at *18 (discrediting plaintiff's description of accident as "less reliable" than other witnesses).

Fourth, Dr. Bizzak credibly opined based on his independent analysis that the March Accident did not occur and, even if contact between the Cadillac and the Truck occurred, only negligible force incapable of causing the damage or injuries Mr. Coleman alleges would have resulted.  (See § II.D.1, supra).  Dr. Bizzak's opinion is supported by photographs of the Cadillac from the scene that, to our eyes, do not show damage from a Sideswipe, such as a scratch across the length of the vehicle or dents in the driver or rear left passenger door, as Officer Peralta testified would have been typical.  (See DX-G; ECF No. 70 at 68:21–69:3).

Finally, Dr. Bosco credibly opined that his examination of Mr. Coleman and the medical records do not exhibit a traumatic injury to his right knee.  (See § II.D.1, supra).  Based on Dr. Bosco's more extensive experience with knee injuries and surgeries, his review of the First MRI Images, and his explanation of the surgical images from Mr. Coleman's knee surgery, we find his opinions more credible than Dr. Wright's, which were based primarily on Mr. Coleman's narrative rather than a careful review of the medical records.  See Alim, 2023 WL 2929380, at *22 (finding plaintiff's expert neither credible nor convincing because her opinions were based solely on plaintiff's narrative and she did not use a goniometer for measurements); Cabrera v. United States, No. 18 Civ. 7270 (SDA), 2020 WL 5992929, at *13–14 (S.D.N.Y. Oct. 9, 2020) (noting that the trial court "has discretion to determine the credibility of the testimony of the [p]laintiff and any medical experts regarding the [p]laintiff's injuries" and finding "persuasive" defendant's expert's (Dr. Bosco) testimony that plaintiff's injuries were not caused by accident).

In the end, we are faced with Mr. Coleman's word against the weight of the evidence—his own exhibits included.  He bore the burden to prove by a preponderance of the evidence that the Government breached a duty owed to him—i.e., that the March Accident occurred and proximately caused his alleged right knee injury—and he has not met that burden, so judgment must be entered for the Government.  See Avlonitis v. United States, No. 16 Civ. 2521 (PKC) (SMG), 2020 WL 1227164, at *8 (S.D.N.Y. Mar. 13, 2020) (granting judgment for defendant where plaintiff failed to adduce credible evidence showing that his injuries were caused by car accident); Watson-Tobah, 2014 WL 6865713, at *14–18 (granting summary judgment for defendants where plaintiff failed to demonstrate that accident proximately caused her injuries); Solomon, 66 N.Y.2d at 1027–28 (affirming judgment for defendant where plaintiff failed to show breach of duty); see also Vogel v. W. Mountain Corp., 97 A.D.2d 46, 48–50 (3d Dep't 1983) (affirming summary judgment for defendant where plaintiff failed to establish duty and explaining that "without a breach, there is no liability").

### 2. "Serious Injury" Under New York Law

Given Mr. Coleman's failure to establish the Government's negligence, our analysis could end there, but we press on for completeness.  See Watson-Tobah, 2014 WL 6865713, at *17–18 (analyzing serious injury notwithstanding failure of proof of negligence).  Mr. Coleman argues that he has demonstrated that he sustained a serious injury under Section 5102(d) because he has "a permanent consequential limitation of use of a body organ or member and/or a significant limitation of use of body function or system."  (ECF No. 75 at 25).  See N.Y. Ins. L. § 5102(d).[14]

---

[14] Mr. Coleman does not invoke any of the other means of demonstrating a serious injury under the No-Fault Law.  (See ECF No. 75).  See N.Y. Ins. L. § 5102(d).

We find that Mr. Coleman has failed to demonstrate that he sustained a serious bodily injury under either standard.

### a.  Permanent Consequential Limitation

Mr. Coleman contends that the March Accident caused permanent consequential limitations to his right knee.  (ECF No. 75 at 25–28).  We conclude that Mr. Coleman has failed to demonstrate by a preponderance of the evidence that, even if the March Accident occurred as he describes it, he suffered any consequential limitation.  We reach this conclusion for three reasons.

First, although the First MRI Report found that Mr. Coleman sustained a traumatic injury his right knee, as Dr. Bosco persuasively explained, the First MRI Images themselves did not substantiate those findings.  (See § II.D.1, supra).  Both the first and fourth findings were pre-existing, non-traumatic conditions; the second and fifth findings were not apparent in the First MRI Images; and the fourth finding, while visible in the images, was degenerative and not the result of a traumatic event like a car accident.  (Id.)  In contrast, Dr. Wright conceded that he did not review the First MRI Images, or any other objective evidence, to support his conclusion that Mr. Coleman sustained a permanent limitation of the use of his right knee.  (ECF No. 72 at 6:8–9, 28:13–29:14).

Second, Dr. Bosco also credibly explained that the May 2021 surgery to Mr. Coleman's right knee was not clinically indicated and that the Arthroscopic Procedures Dr. Guttman performed did not, in fact, repair any traumatic injuries because no such injuries were present.  (See § II.D.1, supra).  Because none of the injuries Dr. Guttman diagnosed were present in the surgical images, those images do not constitute objective evidence of any permanent

consequential limitation to Mr. Coleman's use of his right knee.  See Alim, 2023 WL 2929380, at

*14 (crediting testimony of defendant's expert that surgical procedures performed on plaintiff's

knee were not clinically indicated by surgical images); id. at *23 (finding that there was no

evidence that any of plaintiff's surgeon's diagnoses were present in the MRI or surgical images).

Third, Mr. Coleman relies heavily on Dr. Wright's assessment that his right knee range of

motion was 10 to 90 degrees.  (ECF No. 75 at 27).  As we have noted, however, Dr. Wright failed

to indicate whether his range of motion measurement was a passive or active-assisted

measurement, or whether it was performed with a goniometer, causing us to question its

objectivity.  (See §§ II.D; II.D.1, supra).  "Failing to detail the sort of test undertaken is no small,

hyper-technical matter."  Flores v. Bergtraum, No. 20 Civ. 1240 (KMK), 2022 WL 125372, at *12

(S.D.N.Y. Jan. 13, 2022).  While a passive range of motion test is "based on more objective

criteria," Mastrantuono v. United States, 163 F. Supp. 2d 244, 255 (S.D.N.Y. 2001), "the results of

a passive test will weigh far more heavily in a plaintiff's favor . . . than the results of an active

test."  Flores, 2022 WL 125372, at *12.  Accordingly, we join those courts that have dismissed an

expert's range of motion measurement that fails to specify whether they were passive or active.

See id. (finding unpersuasive plaintiff's expert's range of motion measurements that failed to

specify whether they were passive or active); see Hodder v. United States, 328 F. Supp. 2d 335,

357 (E.D.N.Y. 2004) (finding plaintiff's expert's range of motion findings that did not specify

whether they were passive or active "not particularly useful"); Ruffin v. Rana, No. 11 Civ. 5406

(MHD), 2013 WL 4834368, at *12 (S.D.N.Y. Sept. 4, 2013) (dismissing plaintiff's expert's range of

motion measurements that did not specify whether they were passive or active because it

"remain[ed] unclear to what extent her results reflect objective medical findings rather than

plaintiff's subjective complaints"); see also Gillick v. Knightes, 279 A.D.2d 752, 752 (3d Dep't 2001) ("We have repeatedly held that a diagnosis of loss of range of motion, because it is dependent on the patient's subjective expressions of pain, is insufficient to support an objective finding of a serious injury.")  Even if Dr. Wright had documented whether the 10 to 90 degree range of motion measurement was active or passive, it is inconsistent with the other range of motion measurements in Mr. Coleman's medical records, which showed measurements of 0 to 120 degrees, 0 to 130 degrees, and 0 to 140 degrees—essentially within what Dr. Bosco more credibly testified was a normal range for a person of his age, height, and weight and was consistent with the 0 to 135 degree range of motion of his left knee, which Dr. Wright did not examine.  (DX-W ¶¶ 21, 38, 81; DX-U at USA-Countrywide-02127; PX-6 at USA-Triborough-00013; ECF No. 72 at 69:17–70:6, 72:11–15).  See Alim, 2023 WL 2929380, at *23 (rejecting plaintiff's expert's range of motion measurement that was inconsistent with three other range of motion measurements).

Third, the other evidence at trial undermined the credibility of Mr. Coleman's assertion to Dr. Wright that two of his daily activities were limited since the March Accident: his ability to ambulate moderate distances and his ability to ambulate stairs.  (ECF No. 72 at 46:11–19; PX-4 at McCulloch - Page 14).  At trial, Mr. Coleman testified that he did "[n]ot really" have difficulty or experience pain when walking "moderate distances."  (ECF No. 68 at 63:12–18).  Two years after the March Accident, Mr. Coleman applied for the sanitation position, which involved physical labor and for which he acknowledged he could work eight-hour shifts 40 hours per week and could stand during each eight-hour shift.  (Id. at 68:8–25; DX-X at USA-NYC Parks-00028).  When he worked in that position, he performed physical tasks including cleaning bathrooms,

picking up garbage, sweeping, spraying down trucks, raking, and cleaning gutters.  (Id. at 69:1–13).  Mr. Coleman also acknowledged his ability to ambulate stairs.  (Id. at 71:15–17).  Finally, Mr. Coleman testified that he does not take any pain medication and has not seen a medical provider about his knee since late 2023, which further undermine both his subjective complaints of pain as well as any objective evidence of a significant limitation.  (Id. at 51:21–25, 66:22–25).  See Perez v. United States, No. 17 Civ. 4838 (VSB), 2019 WL 2336526, at *7 (S.D.N.Y. 2019) (finding that plaintiff's testimony that she was not prescribed and did not take any pain medication undermined her assertion that she was in constant and debilitating pain due to the accident).

Accordingly, we conclude that Mr. Coleman has not established through objective medial evidence that he has a permanent consequential limitation of the use of his right knee since the March Accident.

### b.  Significant Limitation of Use of Body Function or System

For similar reasons, Mr. Coleman's contention that he has a significant limitation to his right knee fails.  To constitute a "significant limitation" under the No-Fault Law, "the injury must be significant in both degree and duration."  Alim, 2023 WL 2929380, at *24; see Hodder, 328 F. Supp. 2d at 356 (collecting cases recognizing that "a limitation of twenty percent or more is significant" under the No-Fault Law); Gaddy v. Eyler, 79 N.Y.2d 955, 957 (1992) (explaining that "minor, mild or slight limitation of use" is insignificant under the No-Fault Law).  In addition, "the significance of the limitation must be supported by credible medical evidence and must be objectively measured and quantified."  Alim, 2023 WL 2929380, at *24.  A plaintiff's subjective complaints of pain "are insufficient to establish a 'significant limitation,' unless accompanied by

objective medical evidence of the extent or degree of the limitation and its duration[.]"  Ruffin,
2013 WL 4834368, at *14; see Adams v. Pagano, 1 A.D.3d 779, 780–81 (3d Dep't 2003) (finding
that "minor torn fibers" and "degenerative changes inconsistent with the trauma of a motor
vehicle accident" did not demonstrate significant limitation under No-Fault Law).

As we have explained, there is no objective evidence—whether in the First MRI Images or
the surgical images—to show that Mr. Coleman sustained any traumatic injury from the March
Accident resulting in a significant limitation of the use of his right knee.  Even if we consider
Mr. Coleman's right knee range of motion of 0 to 130 degrees (as credibly measured by Dr. Bosco)
in comparison to his left knee range of motion of 0 to 135 degrees (which Dr. Wright did not
measure), it represents a difference of about 3.7%, which "d[oes] not qualify as a serious injury."
Rose v. Tall, 149 A.D.3d 554, 555 (1st Dep't 2017) (finding no serious injury where plaintiff had
"normal to near-normal range of motion"); see Sellitto v. Casey, 268 A.D.2d 753, 755 (3d Dep't
2000) (holding that 10% loss of range of motion was "not a significant limitation").  Finally, even
if Mr. Coleman had established by a preponderance of the evidence that he had a meniscus tear
in his right knee and that the March Accident caused the tear, "evidence of 'meniscus tears'
standing alone is 'insufficient to establish a serious injury' under New York law 'in the absence of
objective evidence of the extent of the alleged physical limitations resulting from the injury and
its duration.'"  Alim, 2023 WL 2929380, at *24 (quoting Young Sung Lee v. Garvey, 718 F. App'x
11, 12–15 (2d Cir. 2017) (summary order)).  But for the reasons set forth above, Mr. Coleman has
not presented such objective evidence.

We therefore conclude that Mr. Coleman has not established by a preponderance of the
evidence that he suffered a significant limitation to the use of his right knee from the March

Accident.  See Perez, 2019 WL 2336526, at *10 (concluding that plaintiff had not established through objective medical evidence that she had significant limitation of the use of a body function or system).

*     *     *

In sum, Mr. Coleman has not demonstrated by a preponderance of the evidence that he sustained a "serious injury" under the No-Fault Law and therefore, he is not entitled to recover any non-economic damages from the Government.  See Alim, 2023 WL 2929380, at *25; Cabrera, 2020 WL 5992929, at *17.

IV. <u>CONCLUSION</u>

For these reasons, judgment is rendered in favor of the Government and the Complaint is **DISMISSED**.  A final judgment in favor of the Government will be entered separately.


Dated:        New York, New York
              August 27, 2025

                              SO ORDERED.

                              SARAH L. CAVE
                              United States Magistrate Judge